## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

Donald Eugene Ashford,

        Plaintiff,

   v.

Kenton Lee, Connie Wells, Marcia
Sanders, Trisha Corrigan, Brytnee
Dutenhafer,

        Defendants.

Case No. 3:18-cv-50312

Honorable Iain D. Johnston

## MEMORANDUM OPINION AND ORDER

Plaintiff Donald Eugene Ashford, who resides at the Winnebago County Jail in Rockford, Illinois, brings this action under 42 U.S.C. § 1983 seeking recovery for what he sees as constitutionally inadequate medical care under both the Eighth and Fourteenth Amendments to the U.S. Constitution. Ashford originally sued a variety of Medical and Correctional Defendants, as well as the County of Winnebago, Illinois. Dkt. 102. On June 23, 2021, the Court granted the County's motion for judgment on the pleadings. The County remained in the case only for the purpose of indemnification. Dkt. 177. That didn't last long, however, because the County and all the Correctional Defendants stipulated to dismissal about a week later pursuant to a settlement agreement. Dkts. 179–80. Thus, the scope of this action has significantly narrowed, with the only remaining Defendants being those allegedly responsible for Ashford's medical care. Ashford sues Doctor Kenton Lee, Nurse Practitioner Trisha Corrigan, and nurses Connie Wells, Marcia Sanders, and

1

Brytnee Dutenhafer. Nurse Tracy Wroble had been previously named as a Defendant, but she has since been dismissed from this action. The remaining individual Medical Defendants now move the Court for summary judgment. Dkt. 197. For the following reasons, the motion is granted in part and denied in part. The motion for summary judgment in favor of Nurse Sanders is denied. The remaining individual Defendants are entitled to judgment as a matter of law.

## I.    Background

The following factual background is taken from the parties' Local Rule 56.1 statements of undisputed material facts. On August 27, 2016, Plaintiff Donald Eugene Ashford was shot and suffered multiple wounds to his posterior left thigh, and his lower left and right buttocks. As a result, he was treated at the Rockford Memorial Hospital Emergency Department by Dr. Nelly Amador. Dr. Amador immediately ordered an x-ray, which showed the presence of a large bullet fragment about two centimeters in diameter in Ashford's upper thigh. Dr. Spyro Analitis, a trauma surgeon, was present during this evaluation. Early the next morning, at 4:07 AM on August 27, 2016, Dr. Analitis noted that Ashford had "bullet fragments located in both upper thighs." Dkt. 214, ¶ 4. Dr. Analitis put Ashford on a 23-hour observation period to determine the next steps, prescribed him antibiotics and pain medication, and noted that further advisement would follow. Later that day, at 2:25 PM, Ashford checked himself out of the hospital against medical advice before the conclusion of the doctor-order 23-hour observation period. Though Dr. Analitis' notes are silent regarding whether Ashford needed surgery after the observation

period (which had not yet concluded), Ashford remembers being told that he would need to follow up with a doctor or surgeon. Indeed, Ashford testified at his deposition that he was told that a surgeon would be coming by to speak with him. Nevertheless, he chose to check himself out of the hospital against medical advice before those individuals arrived. During Ashford's brief stay at Rockford Memorial, he was prescribed an injection of Ondansetron (also known as Zofran) and tablets of Hydrocodone Acetaminophen (also known as Norco). He was given one tablet of Norco, but both medications were discontinued when Ashford discharged himself.

The parties' statements of fact do not fully address what happened with Ashford's medical care directly after he checked himself out of the hospital against medical advice, though he appears to have merely cleaned and bandages his wounds himself. But several weeks later, on the night of October 10, 2016, Ashford was arrested in connection with events that led to his injuries. The next day, on October 11, law enforcement transported him back to Rockford Memorial Hospital. There, Ashford was examined by Dr. John Fields, who prescribed a Toradol injection and Naproxen for pain. Dr. Fields then discharged Ashford but directed him to follow up with a primary care physician. The notes instruct him to "Call today." Dkt. 199-8, at 84. In addition, the discharge paperwork included the information for Dr. Mark Zarnke, a general and vascular surgeon. Though the information regarding Dr. Zarnke was not listed in the actual discharge instructions section of the paperwork, it was listed in the follow-up information section. *Compare id.* at 84, *with id.* at 86.

The same day, Ashford was booked into the Winnebago County Jail, where he immediately underwent a medical intake evaluation.

The medical intake was performed by Nurse Tracy Wroble, who was recently dismissed as a Defendant in this suit. Her intake recognized that Ashford was treated at Rockford Memorial for gunshot wounds and that he would need wound care for "small scabs to bilat thighs + buttocks." *Id.* at 47. Although she noted that Ashford suffered continued pain from the gunshot wound, she documented that he was not currently prescribed any medication. The records here are a little inconsistent because Wroble noted that Ashford was not on medication, but then noted that he was prescribed 500 mg Naproxen for ten days. She could not have prescribed that herself because nurses do not have prescribing authority. The inconsistency exists in two documents in the record that purport to memorialize Nurse Wroble's intake assessment. The first is the intake form. Dkt. 199-8, at 47. The other is a simple spreadsheet for medical progress notes with handwritten entries that appear to be written a couple hours later. *Id.* at 19. Nevertheless, the discharge paperwork from the hospital establishes that Ashford was prescribed Norco and Zofran. These medications were listed under the section titled "Continue these medications which have not changed." Dkt. 199-11, at 213. The same document also listed Naproxen, 500 mg two per day for ten days, under the section titled "Start taking these medications."[1] *Id.* The notes from Ashford's intake also

---

[1] Although the medication prescribed when Ashford was treated at Rockford Memorial in August 2016 was discontinued when he checked himself out against medical advice, the evidence in the record clearly establishes that his medications documented on October 11 before he was sent to the Winnebago County Jail were not discontinued.

4

establish that Wroble paged the on-call provider for orders and that Ashford would see a medical provider for a follow-up examination two days later, on October 13, 2016.

As expected, Ashford was examined by Defendant Nurse Practitioner Tricia Corrigan on October 13, 2016. She noted that Ashford was experiencing pain and that the Naproxen was not working. Her notes further indicate that Ashford reported to her that he was supposed to have surgery to remove the bullet fragment.[2] She noted that he would not sit on the exam table because he was experiencing pain in his right buttocks, and that he then began to cry due to the pain. The gunshot wounds were healing. Her handwritten notes appear to indicate that one of the wounds was pink, moist, and showing no signs of drainage. Another wound was tender to even a light touch, though she apparently thought Ashford was embellishing the pain. Based on the evaluation, Corrigan decided to discontinue the Naproxen and put Ashford on 600 mg of ibuprofen for fourteen days to see if this different medication would prove more effective. Although the records from Rockford Memorial included a surgeon in the follow-up information section, Corrigan noted that no surgery had been recommended by Rockford Memorial. She also informed Ashford that furlough to get a surgery would have to be obtained through the court and not through the jail's medical staff. Dkt. 199-8, at 21.

_____

[2] Corrigan's notes also indicate the Ashford had been taking Norco and ibuprofen for pain and that he had been seen at Rockford Memorial for clearance before his arrival at the jail. Her notes explain that Ashford was experiencing chills, tingling, and numbness.

Nevertheless, the parties appear to agree that furlough is only required for elective surgeries, not surgeries done under a medical referral to an off-site specialist.

Although Ashford requested surgery, the record indicates a disconnect between the Rockford Memorial Hospital discharge notes and Corrigan's assessment. The discharge paperwork establishes that Ashford should follow-up with a primary care physician *and* Dr. Mark Zarnke, a general and vascular surgeon. Dkt. 199-8, at 84. And Corrigan testified that, because she is not a surgeon, she would not have made the determination of whether surgery was needed herself. Instead, she would refer to the Rockford Memorial recommendations. Indeed, the lack of recommendation of surgery was not her decision; instead, it was her interpretation of the Rockford Memorial recommendation. Dkt. 199-3, at 45 ("Meaning that there was -- when I say no surgery recommended, that in the review of the records that the plan per the surgeon was not to plan any surgery to -- on -- on Mr. Ashford."). But although a follow-up with the surgeon was listed in the discharge notes, Corrigan explained that she did not necessarily believe the notation meant that a referral to a surgeon was required because it wasn't listed in the discharge instructions section.[3] The instructions section explained that a follow up with Ashford's primary care provider was "very important," but it did not mention the surgical consultation. Dkt. 199-8, at 86 ("Follow-up is very important with your primary doctor for this ER visit.

---

[3] Corrigan further explained that, based on her experience with emergency department paperwork, she would have expected any follow-up requirement to be put in the "ED Course" or plan portion of the document, which only refers to Ashford's need to follow up with a primary care physician.

Please call within 1-2 days to relay your symptoms and your visit here. Failure to do so may result in long term health complications."). Notwithstanding that Corrigan has authority to make referrals, she concluded that Ashford first needed a follow-up examination from a primary care provider, and "then the determination would be made whether or not a referral to the specialist was necessary." Dkt. 220, ¶ 11.

On October 17, 2016, Ashford filed a medical grievance complaining that the prescribed medication was not relieving his pain. He explained that the pain was making it difficult to sleep and again requested surgery. Nurse Connie Wells responded to his grievance by explaining that Ashford's chart had been placed for review with a medical provider. On October 21, 2016, Nurse Marcia Sanders examined Ashford and performed what is titled a "comprehensive health appraisal." Dkt. 199-8, at 34–36. In the Local Rule 56.1 statements of undisputed fact, Ashford disputed whether he filled out this appraisal form. But on the form, he referred to himself in the first person. *Id.* at 34 ("Its in my paperwork."). And in his deposition, Ashford confirmed that he signed the document. He further clarified that "now that I see that, the -- I believe I did fill that out." Dkt. 199-1, at 33. Under the "open sores" section, Ashford hand wrote "can't see," and another person (who appears to be Nurse Sanders) wrote "none open." The appraisal notes that Ashford was taking ibuprofen. Under the section title "is there any medicine you should be taking," Ashford wrote "different pain meds."

Three days after the medical appraisal, on October 24, 2016, Ashford submitted two additional medical grievances. In these grievances, he further

complained about his medical treatment, requested copies of his medical records, and asserted that he was not being given medications that were prescribed. He didn't say what medications were not being given to him. Nurse Wells responded that he had already been seen upon arrival at the jail and that he could file a medical request if he wanted to be seen again. She again explained that he could discuss a possible furlough for elective surgery with corrections or the courts, and that over-the-counter medication was available in the commissary. Notably, although Wells responded to some of Ashford's grievances, she never examined him as a patient, and was not otherwise directly involved in his medical care.

On October 30, 2016, Ashford asked to see Dr. Kenton Lee—and not a nurse—because of his ongoing pain. He explained that he believed his wounds were infected. Dkt. 199-8, at 105. Nurse Valerie Lewis, who is not a defendant in this case, responded that the waitlist for the doctor was longer, and he had specifically asked to be seen by the doctor and not the nurse. She further confirmed that he was on the list to see Dr. Lee. The next day, Ashford filed another medical request regarding the same issue. Nurse Lewis again responded that Ashford was on the list to see Dr. Lee.

Also on October 31, 2016, Nurse Sanders examined Ashford and wrote a medical progress note explaining that Ashford's inner left buttock appeared calloused and "hard white." Dkt. 199-8, at 17. The area was sensitive to the touch, and she noted that Ashford had argued that it was infected. In his deposition, Ashford testified that Nurse Sanders told him the wound was infected, but she

8

explained that she would never have said that because she isn't qualified to give medical diagnoses.

The next day, Nurse Dutenhafer authored a hand-written medical progress note, which again explained that Ashford was scheduled to see Dr. Lee on November 4. Dkt. 199-8, at 17.[4] She further wrote that Ashford showed her a bandage with some brown drainage. Nevertheless, she was apparently suspicious regarding the authenticity of Ashford's report of pain because she further noted that he did not appear to be having any difficulty walking and that he walked downstairs and was joking with a correctional officer.[5] Indeed, Nurse Dutenhafer testified at her deposition that she believed his subjective reports of pain were inconsistent with the objective evidence because he was walking fine without appearing to be in pain. She further testified that she did not believe he needed emergent care before his November 4, 2016, appointment with Dr. Lee. *Id.*

---

[4] Defendants' Local Rule 56.1 statement of fact first attributed the progress note to Nurse Sanders. Dkt. 214, ¶ 36. Plaintiff did not dispute the accuracy of that statement of fact. Nevertheless, Plaintiff's Local Rule 56.1 statement of fact asserted that the same medical progress note was written by Nurse Brytnee Dutenhafer. Dkt. 220, ¶ 18. Although Defendants dispute other aspects of that paragraph, they did not dispute that Nurse Dutenhafer was the author of the progress note. Furthermore, Defendants later cited the same note and then attributed it to Nurse Dutenhafer. Dkt. 214, ¶ 41. And in her deposition, Nurse Dutenhafer claimed authorship of the medical progress note. Dkt. 199-5, at 31–32, 37. Thus, all appear to agree that Nurse Dutenhafer authored the medical progress note. Regardless of who authored the progress note, it confirms that Ashford was already on the schedule to see Dr. Lee on November 4, 2016.

[5] Ashford contended in his Local Rule 56.1 statement of fact that Nurse Sanders failed to take him to see Dr. Lee on November 1, 2016, when Dr. Lee was at the jail. Dkt. 220, ¶ 18. But Ashford cited no evidence that Dr. Lee was actually at the jail that day, which would have represented a deviation from his typical schedule. Furthermore, Ashford was already scheduled to see Dr. Lee three days later, and Ashford had already been told that the list to see the medical doctor was longer than the list to see a nurse.

On November 4, 2016, Dr. Lee examined Ashford. Dr. Lee noted Ashford's report that the ibuprofen was not relieving his pain and that he had experienced a green discharge from his wound. Dr. Lee's notes also explain that Ashford apparently removed the bullet fragment from his left medial thigh on his own. Dkt. 199-8, at 15. Nevertheless, Ashford was sitting comfortably on the exam table and his gait appeared only slightly affected from the pain, though Ashford grimaced when Dr. Lee touched the wound. Although Ashford's wounds were tender to the touch, Dr. Lee opined that the wounds were likely not infected—they appeared largely healed with no drainage.

By this time, Ashford had started complaining that boils had started to form. He noted this in medical grievances and requests filed on November 1 and 3, before Dr. Lee's examination. Nevertheless, at the examination, Dr. Lee did not believe the wounds were infected. Still, Dr. Lee prescribed antibiotics to treat any infection in case one existed. *Id.* at 16. Furthermore, though Dr. Lee did not believe Ashford's subjective reports of pain were consistent with the physical examination, he nonetheless ordered an x-ray to ensure that it would not reveal any reasons for Ashford's reported pain—like a fracture.[6] He also prescribed Ashford 650 mg of

---

[6] Ashford takes issue Dr. Lee's testimony that he believed Ashford's complaints of pain were inconsistent with the physical signs and symptoms. Dkt. 214, ¶ 53. Ashford essentially contends that Dr. Lee was wrong because he relied on (1) nurse observations that Ashford was able to walk well in the pod; (2) his own observations of an only slightly affected gait, which Ashford sees as inconsistent with the nurses' report; (3) Dr. Lee's observation that pain in the seated position might not exist while walking; and (4) that he ordered x-rays. These points change nothing. Dr. Lee merely opined that Ashford's reports of pain were inconsistent with what he saw. Dr. Lee did not opine that Ashford suffered no pain. He explained that Ashford's subjective reports were not entirely consistent with the objective evidence. Furthermore, to the extent Ashford is arguing that Dr. Lee was wrong in his

10

Tylenol twice per day for thirty days because Ashford reported that Naproxen and ibuprofen were not working. Dr. Lee did not believe narcotics were appropriate at that time.

On the November 4, 2016, patient visit form, Dr. Lee explained that he reviewed Ashford's medical records from the August 27 and October 11 visits to Rockford Memorial Hospital. Dkt. 198-8, at 16. Based on his review of these records, Dr. Lee also did not think Dr. Analitis or anyone at Rockford Memorial had recommended surgery. In his deposition, Dr. Lee confirmed that the bullet was away from the femoral vessels and did not injure or interfere with any important bodily functions. If surgery were recommended, he would have expected to see that recommendation expressly noted in the records. Like Corrigan, Dr. Lee seems to have equated a lack of a determination regarding whether surgery was recommended with the belief that surgery was not recommended. Indeed, Ashford left the hospital against medical advice before that determination could be made, and his subsequent examination on October 11 before being sent to the jail was narrow in scope and did not contemplate whether surgery was recommended. Dr. Lee's review also revealed that Dr. Fields (at Rockford Memorial) did not find any signs of acute infection at the wound site.

---

assessment, that is a question for a medical malpractice action, not a constitutional tort. *Brown v. Osmundson*, 38 F.4th 545, 551–52 (7th Cir. 2022) (explaining that the plaintiff must establish that the care was so far afield from accepted medical professional judgment that it raises the inference that the defendant did not base the decision on a legitimate medical judgment).

On November 7, Ashford complained that no one scheduled a follow-up visit with him to review the results of the x-ray. Nevertheless, a medical progress note dated November 8 explains that the author "let pt know that xray did not show big bullet fragments except 1 on inner thigh." Dkt. 199-8, at 17. Notwithstanding this note, Ashford again asked to see the x-rays later that day. Dkt. 210-4, at 15 (grievance 483905). He continued to ask for the x-ray imagines themselves, but medical staff instructed him that they were in his medical records, had been reviewed and were negative, and that he could request copies of his medical records upon his release from the jail. *Id.* at 16 (grievance 485680). Medical staff further explained to Ashford that the x-rays showed no fracture on the hip or upper leg and instructed that he could supplement his existing medication with Tylenol or ibuprofen from the commissary. *Id.* at 17 (grievance 487207).

Dr. Lee examined the x-rays on November 8, 2016, and had concluded that the bullet fragment was not the source of Ashford's pain. He determined that one bullet fragment remained in the inner portion of Ashford's thigh, but Ashford did not have any bullet fragment in his buttocks. Because of the location, Dr. Lee did not believe the bullet fragment was the source of Ashford's pain because it was in a different location than the pain Ashford had reported. The location of the bullet fragment was not the only place in question because Ashford had suffered wounds in multiple locations on his thighs and buttocks. Dr. Lee further opined that if the bullet was not the cause of pain, then he would not recommend its removal. Bullet fragments often do not cause extreme pain and can be dangerous to remove because

12

removal could cause nerve damage, leaving the patient in more pain than before the surgery—pain that could be permanent. Furthermore, Dr. Lee did not believe providing Ashford with a medical donut was appropriate. Although Dr. Lee wasn't sure an infection existed, he explained that if the problem was an infection, then the donut would not be appropriate. And regardless, using a donut when pain is reported in the buttocks could aggravate the problem rather than treat it.

In December, Ashford continued complaining about pain and that he had not been shown the x-rays that Dr. Lee ordered. In response, he was told again that the x-rays were normal. He also requested a donut cushion to relieve pressure when sitting, but medical staff again told him that they do not issue donuts. He also complained about developing sores on his hip and leg. On December 28, 2016, he filed a grievance explaining that he had multiple boils on his leg that were causing him pain and getting worse daily. Indeed, Ashford had complained about a boil as early as November 1, 2016, which was subsequently noted during Dr. Lee's examination on November 4, 2016. In response to these grievances, medical staff scheduled Ashford for nurse visits. On December 30, 2016, Nurse Wells spoke to Kellie Gibbons, who is not a defendant in this case. Gibbons was another nurse practitioner at the jail. Because of the reports that pain medication continued to be ineffective, she prescribed additional pain medication. In February 2017, Corrigan again examined Ashford and noted that he had four boils that were *not* in the same location as the bullet wounds. Her treatment plan included antibacterial medication and soap and to keep the area covered. She also told him to apply a warm compress

13

three to four times per day and to avoid picking and scratch the boils. Ashford agreed that the treatment plan eventually worked and that the boils went away during this period of incarceration.

Ashford was convicted on February 15, 2017, and later sentenced on September 27, 2017. He was then transferred into the custody of the Illinois Department of Corrections (IDOC) on October 26, 2017. While at IDOC, Ashford's pain seems to have subsided. He managed the pain with ibuprofen, even though the medical staff at IDOC similarly did not refer Ashford for surgery. Ashford explained that the fragment caused him less pain because he was able to be more active at IDOC and was not required to sleep on hard surfaces.

Ashford filed this suit on September 20, 2018, while in IDOC custody, challenging the adequacy of his medical care at the Winnebago County Jail. On March 5, 2019, Ashford returned to Winnebago County Jail. On April 24, 2020, the Illinois Appellate Court affirmed Ashford's conviction but vacated his sentence. Although ibuprofen sufficiently treated Ashford's pain while in IDOC custody, he again complained of pain on his return to the Winnebago County Jail. The evidence in the record from this second stint at the jail is significantly less, however. He submitted a medical grievance on November 28, 2019, in which he again complained of pain from having been shot multiple times. Nurse Dutenhafer responded by scheduling a nurses visit for the following day. Ashford continued to complain about pain, and on August 21, 2020—after the operative complaint was

14

filed—he was diagnosed with neuropathy.[7] Ashford remains incarcerated at the Winnebago County Jail awaiting resentencing and because he has been charged with additional crimes.

On April 29, 2020, Ashford filed a third-amended complaint, which is now the operative complaint. In it, he alleged a violation of his Fourteenth Amendment rights to adequate medical care for his time at Winnebago County Jail between October 11, 2016, and February 15, 2017, when he was convicted. He also challenged the adequacy of his medical care under the Eighth Amendment for his period of incarceration after February 15, 2017. That claim essentially challenges the same allegedly wrongful conduct: Defendants' continuation of a treatment plan that allegedly failed to relieve Ashford's pain. Because Ashford reached a settlement agreement with the Correctional Defendants, the individual Medical Defendants at issue in this opinion are the only remaining defendants in this case.

## II.    Analysis

On a motion for summary judgment, the movant has the burden of establishing that no genuine dispute of material fact exists and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Facts are material if they might affect the outcome of the suit. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). No genuine dispute exists as to those material facts if the court would be

---

[7] In January 2022, non-Defendant medical providers noted that Ashford suffers from neuropathy because of the gunshot wounds and explained to Ashford that surgically removing the bullet fragment could cause additional nerve damage. Thereafter, Ashford agreed to start taking Gabapentin for pain. Nevertheless, Ashford disputes the accuracy of that medical assessment. Dkt. 214, ¶ 77.

required to grant a Rule 50 motion at trial. *Id.* at 250–51. The court must construe all facts and make all reasonable inferences in favor of the nonmoving party. *Rickher v. Home Depot, Inc.*, 525 F.3d 661, 664 (7th Cir. 2008).

### a. Fourteenth Amendment

Ashford was incarcerated as a pretrial detainee between October 11, 2016, and at least February 15, 2017, when he was convicted of the crime for which he was charged. Because he was a pretrial detainee during this period, any claims he brings challenging the constitutional adequacy of his medical care arise under the Fourteenth Amendment, which presents an objective reasonableness inquiry rather than one of deliberate indifference. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) ("We thus conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective reasonableness inquiry identified in *Kingsley*."). To prevail, a pretrial detainee must establish two elements: (1) that the defendant acted purposely, knowingly, or recklessly, and (2) that the defendant's actions were objectively unreasonable. *Pittman v. City of Madison*, 970 F.3d 823, 827 (7th Cir. 2020). Although the result is the same, some Seventh Circuit panels view this as a four-element analysis that requires the plaintiff to prove (1) that the plaintiff suffered from an objectively serious medical condition, (2) the defendant committed a voluntary act regarding the plaintiff's serious medical need, (3) that act was done purposely, knowingly, or recklessly with respect to the risk of harm,

and (4) that the defendant's conduct was objectively unreasonable under the circumstances. *Gonzalez v. McHenry County*, 40 F.4th 824, 827–28 (7th Cir. 2022).

Critically, the mental state element encompasses all states of mind except those lesser than recklessness. The Fourteenth Amendment is not a substitute for state law negligence or medical malpractice claims and does not provide an avenue to legal redress for merely negligent or even grossly negligent conduct. *Id.* at 827–28. Thus, the defendant must have at least acted recklessly, meaning that the defendant strongly suspected that the conduct complained of "would lead to harmful results." *Pittman*, 970 F.3d at 828.

Furthermore, a plaintiff must show that a defendant sued in her individual capacity is liable for her own conduct. It is not enough to argue merely that a wrongful act was done. The plaintiff must establish that the defendant personally violated the plaintiff's constitutional rights. *Gonzalez*, 40 F.4th at 828. Two other points are essential to this case. First, the professional judgment of a medical provider is presumptively valid. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019). Liability may only be imposed on a medical provider "when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)). So, to prevail, the plaintiff must establish that the defendant medical provider responded to the plaintiff's serious medical needs in a way "that no minimally competent professional would have so responded under

17

the circumstances." *Id.* (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998). Second, nurses are entitled to rely on a medical provider's professional judgment unless that deference is given blindly and without thought. *McCann v. Ogle County*, 909 F.3d 881, 887 (7th Cir. 2018).

### i. Nurse Practitioner Corrigan

Defendants press several arguments in favor of summary judgment for Nurse Practitioner Tricia Corrigan. They contend that Ashford's Fourteenth Amendment claim against her is barred by the two-year statute of limitations. Alternatively, they contend that Ashford's claim fails on the merits.

<u>Statute of Limitations</u>

First, Ashford's Fourteenth Amendment claim against Nurse Practitioner Corrigan is barred by the statute of limitations. Ashford added Corrigan to this action in his third-amended complaint on April 29, 2020. Dkt. 102. The statute of limitations on a § 1983 claim in Illinois is two years. *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 517 (7th Cir. 2019). Because medical care does not necessarily involve a single event, but instead a series of wrongful acts, the continuing violation doctrine can—in some cases—extend the date of accrual. *Id.* "But even under that theory, if a defendant leaves the institution altogether, his involvement in the alleged wrong is over." *Id.* Likewise, if the plaintiff is transferred out of the facility, then the claim against medical staff in the transferor facility accrues on the date of transfer because they no longer have the power to remediate the plaintiff's medical concerns. *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir.

2001) ("This refusal continued for as long as the defendants had the power to do something about his condition, which is to say until he left the jail."). Thus, Ashford's Fourteenth Amendment claim accrued at least on October 27, 2017, when he was transferred to IDOC. So, Ashford's deadline to file suit against Corrigan was October 27, 2019. Because he did not add Corrigan to this suit until April 29, 2020, the claim against her is untimely.

Ashford argues that the Court should apply equitable tolling. The doctrine of equitable tolling excuses a plaintiff's failure to file suit within the limitations period only in extraordinary circumstances. *Rosado v. Gonzalez*, 832 F.3d 714, 717 (7th Cir. 2016); *Savory v. Lyons*, 469 F.3d 667, 673–74 (7th Cir. 2006). The doctrine applies "if the defendant has actively misled the plaintiff, or if the plaintiff has been prevented from asserting his or her rights in some extraordinary way." *Rosado*, 832 F.3d at 717 (quoting *Clay v. Kuhl*, 727 N.E.2d 217, 223 (Ill. 2000)). Ashford contends that the equitable tolling doctrine should apply because he requested access to his medical records and was not immediately given them. Dkt. 209, at 345 ("But Mr. Ashford, despite his diligence, was unable to learn NP Corrigan's identity until December 18, 2019, when the Medical Defendants produced his medical records for the first time."). The argument is meritless. Ashford does not explain how he diligently pursued Corrigan's identity outside of the medical records context. He could have filed a discovery request compelling the information. Furthermore, this Court recruited counsel—different than his current counsel—for Ashford on October 23, 2018, about a year before the statute of limitations expired. He had plenty of

19

time to pursue discovery and identify Corrigan before the limitations period ended. *See Arteaga v. United States*, 711 F.3d 828, 835 (7th Cir. 2013) ("Equitable tolling cannot be premised on the incompetence of the plaintiff's lawyer."). Indeed, even a *pro se* plaintiff may need to file a discovery motion to show sufficient due diligence to warrant equitable tolling. *Bryant v. City of Chicago*, 746 F.3d 239, 243 (7th Cir. 2014). Thus, the Court declines to apply the doctrine of equitable tolling. It is Ashford's burden to show that he diligently pursued the claim against Corrigan and that extraordinary circumstances prevented him. *Herrera v. Cleveland*, 8 F.4th 493, 499 (7th Cir. 2021). He has failed to meet that burden. Thus, Ashford's Fourteenth Amendment claim against Nurse Practitioner Corrigan is time barred.

<u>Merits</u>

Ashford's Fourteenth Amendment claim against Corrigan is time barred. But even if it weren't, she would still be entitled to judgment as a matter of law because the claim fails on the merits. Ashford's arguments in response to Defendants' motion for summary judgment show a misunderstanding of claims challenging the adequacy of medical care under the Constitution. The Eighth and Fourteenth Amendments are not a substitute for state law medical malpractice and negligence claims. Indeed, Ashford must show that that Corrigan was beyond grossly negligent and was instead reckless in relation to his serious medical needs. *Gonzalez v. McHenry County*, 40 F.4th 824, 827–28 (7th Cir. 2022). Yet, throughout Ashford's argument, he contends that she made mistakes or failed to meet the standard of

care. Those arguments should be directed to a negligence action, not a constitutional tort claim.

Ashford cannot prevail on his Fourteenth Amendment claim against Nurse Practitioner Corrigan because nothing in the record evidence establishes that she acted at least recklessly with respect to his serious medical needs. The record is void of any evidence that she strongly suspected that her actions would lead to harmful results. The most problematic evidence in the record is that Corrigan reviewed Ashford's discharge records from Rockford Memorial and concluded that Dr. Fields had not recommended surgery. But no one at Rockford Memorial had reached the point of even making a surgical recommendation. Ashford defied his own medical needs by leaving the hospital against medical advice in August before the surgical consult could take place. And Dr. Fields' evaluation before Ashford was sent to jail on October 11 was very limited in scope and did not include a determination regarding whether surgery should occur. Indeed, when faced with discharge paperwork that included the information for a surgical specialist, the more diligent approach may have been to refer Ashford for a surgical consult. But Corrigan mistakenly read the Rockford Memorial paperwork as affirmatively not recommending surgery.[8]

---

[8] Ashford faults Corrigan for not ordering a follow up visit a physician, presumably Dr. Lee. Dkt. 209, at 30. But Corrigan is a Nurse Practitioner, and thus she is a medical provider in her own right. Ashford offers no authority for the proposition that a medical provider is required to refer a patient to another medical provider before determining whether her treatment plan was working.

Although Ashford contends that Corrigan's examination on October 13, 2016, was insufficient, his argument fails to show how it was constitutionally inadequate. For example, he complains that she didn't address his pain. But although she believed he might be embellishing the pain, she changed medications to see if ibuprofen would work better than Naproxen. Changing course to try another medical treatment reflects a medical provider trying to remedy the patient's concern. It does not show that the medical provider was reckless in the face of the patient's pain, even if the patient would have preferred a stronger pain medication (like a narcotic). *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) ("We routinely have rejected claims, however, where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment.") (emphasis in original).

Corrigan next examined Ashford in February 2017. Ashford's primary complaint then was that he had boils on his thighs. Corrigan located four boils that were not in the same location as the gunshot wounds. She prescribed an antibiotic and told Ashford to clean the affected areas with antibacterial soap and to apply a warm compress. Ashford later confirmed that the boils were improving. Ashford contends that although he was suffering from ongoing pain, Corrigan did nothing to treat his concerns. But Corrigan prescribed an antibiotic to treat Ashford's boils, which she viewed as the primary reason for his visits in February. That was not a reckless decision. Indeed, it appeared to work.

22

Finally, Ashford notes that his retained expert opined that Corrigan's medical treatment fell below the standard of care. Dkt. 209, at 32 (arguing that Corrigan's treatment plan and her failure to refer him to a surgical specialist "were all contrary to the standard of care."). But that is not the test. Whether a medical provider's care met the required standard in the community is not sufficient to establish a constitutional claim. *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 486 (7th Cir. 2022) ("Although the two expert witnesses disagreed as to whether Nurse Smith's care was professionally appropriate, there is no support for a finding that her approach was deliberately indifferent."). Indeed, Ashford must be able to establish that Corrigan's treatment was such a substantial departure from accepted practice that she effectively failed to exercise even minimally competent professional judgment. *Johnson*, 936 F.3d at 707. Ashford cannot meet that high bar, and so Corrigan is entitled to summary judgment.

### ii. Nurse Wells

Nurse Wells' role in the events giving rise to this action stand in contrast to the other Defendants because she was not directly involved in any medical care that Ashford challenges. Indeed, his only complaint regarding Nurse Wells is the way she responded to his various medical grievances. Specifically, Ashford challenges her purported inaction. He explains that, in December 2016, Nurse Wells spoke to Nurse Practitioner Kellie Gibbons (who is not a Defendant) about Ashford's treatment plan and whether he should be prescribed additional medication. In Ashford's view, this shows that she could have done the same thing earlier but

23

failed to do so. Dkt. 209, at 42. Citing the language typically used to hold supervisors liable under § 1983, Ashford contends that Nurse Wells can be held liable notwithstanding that she was not directly involved in Ashford's care. *Id.* ("As courts have held, an individual who knows of conduct and facilitates, approves, condones, or turns a blind eye to it bears personal responsibility for the conduct."). Ashford's response does not directly challenge any specific grievances that he believes Nurse Wells wrongly responded to. He merely contends that her responses were vague and unhelpful and that she told him that he would need a furlough to receive surgery. He further argues that she should have raised his request for a "reasonable accommodation" with a medical provider.[9] Dkt. 209, at 43.

Ashford's contention that Nurse Wells should have done more to provide him with reasonable accommodations for his ongoing pain must fail. Nurses are entitled to defer to medical providers' orders, so long as the deference is not done blindly and unthinkingly. *McCann v. Ogle County*, 909 F.3d 881, 887 (7th Cir. 2018). And Dr. Lee explained that he did not believe giving a medical donut to Ashford was an appropriate treatment. Nurse Wells cannot defy the treatment plan of a medical provider or ignore Dr. Lee's legitimate medical judgment. Furthermore, Ashford talks past Defendants when he faults them for telling him he would need a furlough for surgery, or that he would need assistance from his counsel or the courts. As Defendants have explained many times, that was the policy for elective surgeries. Thus, the real contention is whether the surgery was elective, not whether the

---

[9] Although Ashford uses the legal phrase "reasonable accommodation," he does not bring any claim under the Americans with Disabilities Act.

nurses were correct when they told him he would need a furlough for elective surgeries. And the determination regarding whether a surgery is elective is far outside the scope of a nurse's duties.

Ashford's claim against Nurse Wells comes down to whether her actions in response to his various grievances were constitutionally inadequate under the Fourteenth Amendment. Although nurses should defer to the medical judgments of nurse practitioners and doctors, they also have an independent duty to provide appropriate medical treatment. This could require them to confront those medical providers with concerns or even elevate their concerns to a responsible administrator. *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015); *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). But nothing in Nurse Wells' responses to Ashford's grievances evidence recklessness to Ashford's medical needs, nor were her responses objectively unreasonable. On October 17, 2016, she responded by placing his file for review with a provider. Dkt. 210-4, at 10. On October 24, Ashford argued that he wasn't being treated properly and asked to see the doctor. She responded that he had already been seen by a provider, was placed on pain medication, could purchase more at the commissary, and could submit a request (rather than a grievance) if he wanted to be seen by the provider again. *Id.* at 11. She then told him two days later that she was unable to release his medical records and that he would need to address that with his attorney and the corrections staff to fill out the necessary paperwork. *Id.* at 12.

25

On November 1, 2016, he complained that no one took him to see Dr. Lee. Nurse Wells responded that Ashford was already on the schedule to see Dr. Lee three days later on November 4, 2016. *Id.* at 13. The same day, he explained that he was leaking green puss from his wounds. She responded that he had been seen several times by nursing staff, including on that same day, and again that he was already scheduled to be examined by Dr. Lee. She also explained to him that if he needed to be seen by a nurse before the appointment with Dr. Lee, then he should submit a sick call request. *Id.* at 14. On November 3, Ashford again complained about green puss. Nurse Wells responded that he would be seen for a clinic visit that day. *Id.* On December 1, Ashford filed a grievance again complaining about pain and explained that his pain medication was not working. Nurse Wells responded that Ashford should place a nurse sick call request for an assessment and that he could also request to be seen by a medical provider. He then noted (and directed the grievance to her) that he did not want the clinic visit because he did not want to pay for it. *Id.* at 20.

The next grievance Wells responded to was on December 29. Ashford complained about the presence of boils and that it was making it difficult for him to walk. Nurse Wells responded that he would be seen that day to assess his signs and symptoms. *Id.* at 22. The next day, Ashford again complained that his pain medication was not working. Nurse Wells responded that he was given the first dose of the current pain medication the previous night along with a new antibiotic. She explained that he was scheduled to receive the medication for several days and

should give the medication time to work. She also told him that the provider was made aware of his contention that the pain medication was not working, and that Tylenol had been added to his list of medications. *Id.* at 22–23.

Ashford has not explained how these responses violated his constitutional rights, or how they were even wrong. These responses do not show a nurse blindly following doctors' orders and allowing constitutional wrongs to persist. They show a nurse attempting to provide helpful answers to a flurry of grievances and medical requests. In some situations "when a nurse is aware of an inmate's pain and the ineffectiveness of the medications, a delay in advising the attending physician or in initializing treatment may support a claim" under the Constitution. *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 485–86 (7th Cir. 2022). This is not that case. Nurse Wells was not directly involved in Ashford's medical care, and her responses to his grievances showed the appropriate level of deference to both Nurse Practitioner Corrigan and Dr. Lee, both of whom examined Ashford during this period. Indeed, Ashford's argument makes Nurse Wells' point. Once she felt like enough was not being done, she consulted with another Nurse Practitioner to determine the best course of action.

Thus, no reasonable jury could find Nurse Wells liable under the Fourteenth Amendment, so she is entitled to judgment as a matter of law.

### i. Nurse Dutenhafer

Like Nurse Practitioner Corrigan, Ashford's Fourteenth Amendment claim against Nurse Dutenhafer fails both on the merits and because it is time barred.

The same statute of limitations analysis regarding Nurse Practitioner Corrigan applies to Nurse Dutenhafer. She was not added to this action until April 29, 2020. Dkt. 102. Because Ashford was transferred to IDOC on October 27, 2017, however, the statute of limitations had expired at least by October 27, 2019, well before the third-amended complaint was filed. Thus, Ashford's Fourteenth Amendment claim against Nurse Dutenhafer is time barred. Nevertheless, the claim also fails on the merits.

Nurse Dutenhafer played a limited role in Ashford's medical care as a pretrial detainee. She examined Ashford during medical pass on November 1, 2016, and that examination forms the basis for Ashford's Fourteenth Amendment claim against her. He told her that he was experiencing drainage at the wound site and showed her a discolored bandage. Following the medical provider prescription, she gave him 400 mg of ibuprofen. Ashford faults her for doing nothing beyond the already prescribed medication. Nurses, however, do not have prescribing authority. Nevertheless, Dutenhafer discounted Ashford's reports of pain because he appeared to be walking without pain (including down some stairs), had a steady gait, and was joking with a correctional officer. She saw no emergent reason to schedule Ashford for a medical provider visit before his appointment with Dr. Lee, which was already scheduled for three days later. Even if her decision were wrong, no evidence suggests that she strongly suspected Ashford was a risk of harm and nevertheless ignored that risk, so she is entitled to judgment as a matter of law. *Pittman v. City of Madison*, 970 F.3d 823, 828 (7th Cir. 2020).

### ii. Nurse Sanders

Defendants next move for summary judgment for Nurse Sanders. The crux of Ashford's case against her comes down to her interactions with him in October 2016. On October 21, 2016, she performed a health assessment of Ashford. The resulting paperwork notes no open sores, but Ashford explained on the paperwork that he wanted different pain medication. Ten days later, she again examined Ashford and noted that his inner left buttock appeared calloused and hard white and that it was sensitive to the touch. Ashford testified that she told him the area was infected. In response to the allegedly infected wound site, she instructed Ashford to let correctional officers know if he became unable to walk. Dkt. 199-8, at 17 ("IM encouraged to let officers know if unable to walk.").

Defendants make several arguments in favor of summary judgment for Nurse Sanders. First, they contend that Ashford failed to include all facts against Nurse Sanders in the third-amended complaint, and so claims regarding those facts are not properly before the Court. But that is not the way the federal notice pleading standard works. Ashford is not required to include all facts learned in discovery in his complaint. He is merely required to plead enough factual allegations to raise the inference of liability. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In some circumstances, claims may be improper if the factual basis for those claims is completely different than what was pleaded in the complaint. For example, in *Colbert v. City of Chicago*, 851 F.3d 649 (7th Cir. 2017), the plaintiff alleged that the defendants had searched his residence in an unreasonable manner. At the summary

29

judgment stage, however, the plaintiff argued that the defendants searched his person with unreasonable force, took his keys, and then searched his bedroom unlawfully. The court viewed the new argument as asserting an independent claim unsupported by allegations in the complaint. *Id.* at 656. Because these were effectively new claims not pleaded in the complaint, the plaintiff had not put the defendant on notice of those claims and had instead improperly asserted new claims at summary judgment. *Id.* at 656–57.

Introducing new claims at summary judgment is not appropriate. *Id.* at 656 (quoting *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014); *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859–60 (7th Cir. 2017). But that is not what Ashford did here. His complaint includes sufficient facts to put Nurse Sanders on notice of the claim against her, and he does not seek to hold her liable for claims that are independent of that factual basis. The mere fact that Nurse Sanders examined him on more days than he pleaded in the complaint is not enough to change the analysis. To hold otherwise would undermine the purpose of notice and plausibility pleading. And regardless, the crux of Ashford's claim against Nurse Sanders is that she told him the wound site was infected and merely responded by telling him to contact a corrections officer if he became unable to walk. And that is precisely what Ashford alleged in the third-amended complaint. Dkt. 102, ¶ 45.

Next, Defendants argue that there's no evidence in the medical record to support Ashford's contention that Nurse Sanders told him the wound was infected.

Indeed, Nurse Sanders' medical progress note explains that Ashford argued with her that it was infected, rather than her telling him that. Dkt. 199-8, at 17. But deposition testimony is sufficient evidence on summary judgment. Fed. R. Civ. P. 56(c)(1). And Ashford's deposition testimony that she told him the site was infected creates a factual dispute. On summary judgment, the Court must accept Ashford's version of the facts, and so the Court assumes that Nurse Sanders indeed told Ashford that the site was infected. *Rickher v. Home Depot, Inc.*, 525 F.3d 661, 664 (7th Cir. 2008). Defendants effectively ask the Court to make a credibility determination and decide the question of fact. But that is for the jury, not the Court. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

Defendants also argue that Ashford's testimony is not sufficient evidence because Nurse Sanders does not have the qualifications or authority to make medical diagnoses. That argument misses the point. It doesn't matter if she had the authority to make a medical diagnosis. All that matters is that she was aware of the risk of harm. And if she told him that he had an infection, then a reasonable jury could conclude that she believed he was at risk of harm. Even if she were wrong, she would still have had the requisite mental state. And if the wound indeed was not infected, then her error would be relevant to causation and the amount of

31

damages, but it would not change the analysis of whether she recklessly disregarded a risk of harm that she believed to be present.[10]

Defendants further contend that Ashford's claim against Nurse Sanders must fail because he cannot establish that she acted at least recklessly; that she strongly suspected that her actions would lead to a harmful result. Dkt. 201, at 28–29. In support, Defendants note that Ashford was already scheduled to see Dr. Lee four days later, and that Nurse Sanders observed no objective signs of pain or difficulty ambulating. Ashford responds that Nurse Sanders was more than capable of escalating the potential infection to a medical provider, but instead she told him to let a correctional officer know when he was no longer able to walk. She could have contacted Nurse Practitioner Corrigan, for example, but she left him to suffer with an infected wound site, and the pain it caused, for four additional days. Three days later, on November 3, 2016, Ashford complained in a medical grievance that he did not feel right, that he felt weak in his legs, and that he could not stand for very long. He explained further that his stomach was hurting. He wanted to be seen in "a real hospital" because he thought something bad might happen. Dkt. 220, ¶ 19.

---

[10] Defendants also seem to argue that if the wound was not infected, then it was not a serious medical condition. Dkt. 201, at 26 (arguing that the "record contains insufficient to establish that Plaintiff ever suffered from a serious medical condition in the form of an infected bullet wound at any time during his confinement in the WCJ."). If that is what Defendants intended to argue, then it is wrong. A medical need is serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021) (quoting *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012)). Ashford's medical needs were objectively serious. They were diagnosed by doctors, and his wounds were documented as needing wound care upon intake at the jail. Regardless of the presence of an infection, wounds caused by the existence of a gunshot and the presence of bullet fragments in the body are objectively serious.

Nurse Sanders responded to his grievance by explaining that he was scheduled to see Dr. Lee the following day and to inform a correctional officer if he believed the problem was an emergency. *Id.* Ashford contends that Nurse Sanders should have responded differently because it is not Ashford's job to determine whether the medical need is an emergency.

The evidence is sufficient to allow a reasonable jury to infer that Nurse Sanders strongly suspected that her conduct would lead to harmful results and nevertheless ignored the risk. The evidence is likewise sufficient to allow a reasonable jury to conclude that Nurse Sanders' conduct was objectively unreasonable. The Court must accept Ashford's version of the facts, and thus that Nurse Sanders told him the wound was infected, and all reasonable inferences stemming from those facts. So, she believed Ashford was at risk of harm because he suffered from an infection and the resulting physical symptoms, which included pain. In response, she did nothing because he was already scheduled to see Dr. Lee four days later. A reasonable jury could conclude that she ignored the risk of harm Ashford faced between that examination and his visit with Dr. Lee. This is especially so because he later told her that he was feeling weak and could not stand for more than a short period, yet she still did not notify a medical provider or even document his symptoms in the medical records.

Furthermore, a reasonable jury could conclude that failing to at least consult with a Nurse Practitioner was objectively unreasonable. Indeed, even under the more rigorous deliberate indifference test, a plaintiff need not prove that he was

33

"literally ignored." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016). And regardless of the pending examination with Dr. Lee, nurses have an independent obligation to provide constitutionally adequate medical care, which on occasion will mean they have an independent duty to contact a medical provider on the inmate's behalf. *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015). To be sure, four days is not a long wait. But if the jury resolves the disputed fact—and its inferences—in Ashford's favor, then Nurse Sanders did nothing about a painful infection for four days. *See Ortiz v. City of Chicago*, 656 F.3d 523, 538 (7th Cir. 2011) (explaining in the Eighth Amendment context the well-settle principle that "providing no medical care in the face of a serious health risk constitutes deliberate indifference"); *Ayoubi v. Dart*, 729 F. App'x 455, 459 (7th Cir. 2018) (noting that "the standards are virtually indistinguishable"). Though the short duration might reduce the damages at issue, a reasonable jury could nonetheless view her lack of a response to Ashford's pain and infection as constitutionally inadequate.[11]

Therefore, the Court denies Defendants' motion for summary judgment in Nurse Sanders' favor.

---

[11] Defendants also contend that Ashford lacks verifying medical evidence that the delay caused harm. Indeed, a plaintiff challenging the constitution adequacy of his medical treatment in the face of a delay must provide verifying medical evidence establishing the detrimental effect of the defendant's conduct. *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1034 (7th Cir. 2019). That is not a concern here, however, because the medical records are sufficient to allow a reasonable jury to conclude that Ashford suffered additional pain as a result of Nurse Sanders' inaction. That is enough. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).

### iii. Doctor Lee

Lastly, Defendants move for summary judgment in favor of Dr. Lee. Ashford takes issue with Dr. Lee's medical treatment of him during the November 4, 2016, examination. Dkt. 209, at 21 ("Having knowledge of Mr. Ashford's serious medical condition, Dr. Lee's treatment plan and subsequent actions were objectively unreasonable and recklessly disregarded Mr. Ashford's ongoing pain."). Ashford continues that he told Dr. Lee about the purported infection, that he had been told the bullet fragment *could* be removed, and that he wanted to have the surgery. In the meantime, he wanted a donut cushion to sit on. *Id.* Ashford further takes issue with Dr. Lee's decision not to schedule a follow-up visit with Ashford to go over the result of the x-ray and with Dr. Lee's lack of a referral to a surgical specialist for a consult.

None of this amounts to a violation of the Fourteenth Amendment. Rather, the evidence merely establishes the Ashford disagreed with Dr. Lee's medical judgments. Regarding the potential infection, Dr. Lee believed Ashford likely did *not* have an infection. Nevertheless, he prescribed an antibiotic just in case. Indeed, Dr. Lee treated the condition Ashford believed existed although he wasn't sure that the condition existed. Furthermore, although Dr. Lee saw Ashford's subjective reports of pain as inconsistent with the objective evidence, he still ordered an x-ray to rule out other sources of pain. Next, because Ashford complained of continued pain, and even though Dr. Lee saw the complaint of pain as inconsistent, he nevertheless changed course from previous medication and prescribed Tylenol.

35

Ashford may have preferred a stronger medication, like a narcotic, but Dr. Lee is not required to provide Ashford with his choice of medication unless the decision represents a substantial departure from accepted medical judgment. *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019).

Dr. Lee's decided not to give Ashford a medical donut cushion because his medical judgment was that the donut could make the problem worse. Dr. Lee explained that the donut cushion was an inappropriate treatment in Ashford's case because it could have exacerbated his injury. And there's no evidence in the record to suggest that this decision was so far afield from accepted practice that it was not legitimately based on professional medical judgment. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019).

In the end, Dr. Lee opined that Ashford's pain likely was not caused by the bullet fragment itself. Indeed, that was one reason for ordering an x-ray to look for any fractures. And Dr. Lee explained that if the bullet fragment were not the source of Ashford's pain, then he would not recommend surgery because it could be dangerous and leave Ashford in more and permanent pain. That is a medical judgment. To the extent that Dr. Lee was wrong, and to the extent that he read the Rockford Memorial records incorrectly, those errors fall within the gambit of negligence. *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) (failure to choose the best course of treatment amounts to negligence, not a constitutional violation). Because there's no evidence in the record that Dr. Lee's actions represented a substantial departure from accepted medical practice, his judgment is entitled to

deference, and he is entitled to summary judgment. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663 (7th Cir. 2016) ("But no expert testified that Dr. David's chosen course of treatment was a substantial departure from accepted medical judgment, and the decision was not so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony.").[12] Far from establishing that Dr. Lee acted with recklessness toward Ashford's medical needs or that his conduct was objectively unreasonable, the evidence establishes that he treated Ashford's symptoms and merely disagreed regarding the need for surgery.

### b. Eighth Amendment

Because Ashford was convicted in February 2017, part of his medical care at the Winnebago County Jail arises under the Eighth Amendment's prohibition on cruel and unusual punishment. *Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019). Even on his return to the jail, he was still incarcerated as a convicted inmate because his conviction was not vacated—he merely needed to be resentenced.

---

[12] Ashford hired Dr. Vincent Cannestra as an expert witness in this case. He filed a report, and a supplement to that report. Dkt. 199-13; Dkt. 212. Nothing in Dr. Cannestra's report is sufficient to defeat summary judgment. Dr. Cannestra's opinion may be enough to require a jury to decide if Dr. Lee's treatment of Ashford breached his duty of care. But Dr. Cannestra's expert report fails to discuss whether Dr. Lee's medical decisions were such a substantial departure from accepted medical practice as to not be legitimately based on medical judgment. The report is instead rife with evidence only relevant to a negligence action. Even if a jury were to find all aspects of Dr. Cannestra's report credible, it implies only that Dr. Lee was negligent. It says nothing about whether his decisions were such a departure from standard practice that no minimally competent professional would have taken Dr. Lee's course of action. *See Davis v. Kayira*, 938 F.3d 910, 915 (7th Cir. 2019); *Whiting*, 839 F.3d at 663.

To prevail on an Eighth Amendment claim for inadequate medical care, the plaintiff must establish (1) that he suffers from an objectively serious medical condition, and (2) that the defendant was deliberately indifferent to that serious condition. *Id.* In other words, the claim challenges a deliberate decision to provide medical treatment "in a particular manner." *Id.* (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). Defendants moved for summary judgment on Ashford's Eighth Amendment claim on the theory that the evidence in the record is insufficient to sustain that claim against any of the individual Defendants. Though Ashford generally lumped all Defendants together in his allegations under the Eighth Amendment, Ashford's response brief addresses only Defendants Dr. Lee, Nurse Practitioner Corrigan, and Nurse Dutenhafer.

### i. Doctor Lee and Nurse Practitioner Corrigan

Ashford returned to Winnebago County Jail on March 5, 2019, from the Illinois Department of Corrections. The IDOC medical staff similarly had not removed the bullet fragment from Ashford's body, though Ashford reported that ibuprofen, exercise, and a more comfortable bed remedied his pain while in IDOC custody. Ashford contends that Dr. Lee and Nurse Practitioner Corrigan were made aware of his continued pain at least by the time he was served with the operative complaint in April 2020. Thereafter, according to Ashford, they failed to remedy his pain. But the only time Dr. Lee examined Ashford during the time in which the Eighth Amendment applies was in May 2020. And Ashford's response reveals no instances in which Nurse Practitioner Corrigan examined Ashford during that

38

period. The parties Local Rule 56.1 statements of fact similarly reveal no additional interactions between Ashford and Lee or Corrigan during this period.

The Court is perplexed as to how the filing of the operative complaint could possibility make a defendant aware of a serious medical need. The argument effectively admits that no claim yet existed at the time of the filing of the operative complaint because it means that all facts giving rise to the claim occurred after the operative complaint was filed. This is not a case in which evidence that occurs after the complaint was filed is used to prove a claim that arose before the complaint was filed. Instead, the entirety of the Eighth Amendment claim against Dr. Lee and Nurse Practitioner Corrigan arose after the operative complaint was filed. As Defendants point out, a plaintiff is not permitted to add claims through summary judgment briefing. Dkt. 222, at 37; *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859–60 (7th Cir. 2017).

In some instances, a plaintiff will be permitted to amend the operative complaint to conform to the facts discovered during litigation. Moore's Federal Practice § 1518. But Ashford never sought leave to amend. That wouldn't matter if Defendants expressly or impliedly consented to proceed without an amendment. *Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 879 (7th Cir. 2005). Federal Rule of Civil Procedure 15(b)(2) expressly provides for amending the operative complaint even after judgment:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to

amend the pleadings to conform them to the evidence and to raise an unpleaded issue.

But the plain text of Rule 15(b)(2) requires either express or implied consent by the defendant. In this case, Defendants have expressly objected to Ashford raising issues not pleaded in the complaint. Indeed, Rule 15(d) further addresses the procedure a plaintiff can take to supplement the complaint in lieu of an amendment:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense.

Ashford never sought leave to supplement or amend the operative complaint. He rested on the third-amended complaint. By his own argument, his claims against Dr. Lee and Nurse Practitioner Corrigan are improper because they occurred after the operative complaint was filed and no supplemental pleading exists.

Nevertheless, even if the claims were properly before the Court, they would still fail. Dr. Lee examined Ashford only once during his incarceration as an inmate (as opposed to a pretrial detainee). That examination took place on May 18, 2020. Nothing in that examination substantiates a claim of deliberate indifference. Dr. Lee's handwritten notes discuss that Ashford had gained some weight, but it was steady since January of that year. Ashford apparently complained of some lower back pain. Furthermore, the notes seem concerned about a potential thyroid problem, so labs were drawn to make sure that was not an issue. Dkt. 199-9, at 12–13. The Court is unaware how anything in this evidence establishes deliberate

40

indifference on the part of Dr. Lee, and Ashford's response brief does not even attempt to answer that question. Further, nothing in the record establishes that Nurse Practitioner Corrigan had any interactions with Ashford whatsoever during the time in which the Eighth Amendment applies. Again, the parties Local Rule 56.1 statements of fact and the briefing is void of any evidence that Corrigan was personally involved in any purported violation of Ashford's Eighth Amendment rights.

Instead, Ashford contends that Dr. Lee and Corrigan were aware of his medical needs and did not actively inject themselves into Ashford's medical care to do something about it. But Ashford must show how Dr. Lee and Corrigan were personally involved in a purported constitutional violation. It is not enough to merely note that they were employed as medical providers at the jail during the relevant period. *Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010) (holding that a medical director is not liable without evidence of personal involvement in a constitutional injury). The claims must fail. Dr. Lee and Nurse Practitioner Corrigan are entitled to judgment as a matter of law.

### ii. Nurse Dutenhafer

Nurse Dutenhafer was more involved in Ashford's medical care during the relevant Eighth Amendment period, but only as a part of the grievance process. None of her conduct substantiates a claim under the Eighth Amendment.

On November 28, 2019, she responded to Ashford's medical request regarding pain by scheduling a nurse visit for later that same day. Dkt. 210-4, at 80. She then

responded to his request to see a medical provider by placing him on the list to see a medical provider. *Id.* at 88. Ashford points to no evidence that Nurse Dutenhafer examined him during this time, just that she responded to these two grievances. The next interaction Ashford points to was in November 2020, well after the operative complaint was filed. Again, Nurse Dutenhafer merely responded to a grievance. This time, Ashford complained that he had been taken off his medication in the prior few days and he wanted to know what the next steps would be. She responded that he had money available on the books to purchase medication at the commissary. She explained that if the medicine at the commissary was ineffective then he would need to schedule a nurse visit. Dkt. 210-7, at 55. She further responded to three different requests in January 2021. First, Ashford noted that he was on Naproxen and wanted a higher dose. She responded by scheduling a nurse visit. *Id.* at 63. Later, he asked for a refill on his Naproxen, and she explained that refills must be ordered by a medical provider. She told him to include information regarding his symptoms before proceeding. *Id.* at 58. In response Ashford accused the medical staff of giving him the run around and threatened to involve his attorney. He noted that they have his chart and should know what medication he needs to have refilled, though he did not respond to Nurse Dutenhafer's request for him to include his persisting symptoms. She responded by again requesting more information.

In March 2021, Ashford noted that his physical therapy had ended, and he wanted to continue it. Dutenhafer responded that an extension of his physical

42

therapy would have to be reordered by a medical provider. She noted that he would need to schedule a nurse visit and include the persisting symptoms that make continued physical therapy necessary. *Id.* at 69. When he asked again in May 2021, she reiterated the same response. *Id.* at 75.

Ashford contends that Dutenhafer's responses to his grievances are "non-responses [and] are typical of Nurse Dutenhafer's deliberate indifference to Mr. Ashford's pain throughout his second period of incarceration at WCJ." Dkt. 209, at 53. Yet, Ashford still fails to show how Nurse Dutenhafer was directly involved in his medical care outside the grievance process. He has presented no evidence that she examined him during this period. He merely takes issue with her responses to his grievances. Still, none of her responses appear to even be wrong, let alone something more than grossly negligent. Again, Ashford attempts to hold a defendant liable on a theory of inaction, without ever establishing how she was involved in his medical care. That is not the way § 1983 claims work. *Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010). Ashford effectively contends that Nurse Dutenhafer was on notice of his concerns, and thus had a duty to remedy his medical needs. Because she never ventured outside her role in the grievance process, Ashford contends that she breached her duty to render proper medical aid. That is nothing more than a rebranded negligence claim. It is not enough to sustain a constitutional tort. *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) ("Deliberate indifference requires something more than negligence or even medical malpractice."). The motion for summary judgment is granted.

III.    **Conclusion**

For the foregoing reasons, the Court grants in part and denies in part the Medical Defendants' motion for summary judgment [197]. All individual Defendants except Nurse Sanders are entitled to judgment as a matter of law. Ashford's claim against Nurse Sanders continues. The remaining parties are referred to Magistrate Judge Schneider to discuss settlement or prepare the final pretrial order. As the parties and their counsel likely know, holding a federal jury trial based on a single claim that Ashford allegedly suffered pain for four days is not a good use of resources.

Date:  August 26, 2022

Honorable Iain D. Johnston
United States District Judge